BALDWIN *v.* VILLAGE OF CHESANING.

INTOXICATING LIQUORS—LICENSES—INVALID ORDINANCE—DURESS.

Where plaintiff hotel keeper brought suit to recover an amount paid to defendant village under an invalid ordinance, under threat by defendant's officers that the council would not grant his application for a liquor license unless he complied with the terms of said ordinance, his payment of the money without protest is *held* to be a voluntary payment, and without duress.[1] BROOKE, C. J., and MCALVAY, KUHN, and BIRD, JJ., dissenting.

[1]As to when payment of license fee is made under duress, see note in 22 L. R. A. (N. S.) 873.

As to right to recover back license fee unlawfully exacted under color of authority, see note in 49 L. R. A. (N. S.) 387.

Error to Saginaw; Gage, J. Submitted April 13, 1915. (Docket No. 68.) Decided September 28, 1915.

Assumpsit by Thad G. Baldwin against the Village of Chesaning for money paid to defendant under an invalid ordinance. Judgment for defendant on a directed verdict. Plaintiff brings error. Affirmed.

*A. Elwood Snow,* for appellant.

*Charles W. Cheeney* and *R. L. Crane,* for appellee.

MOORE, J. The plaintiff is a resident of the village of Chesaning, and has been for 34 years. He was engaged as a saloon keeper in partnership with one Sutter. Their license expired May 1, 1912.

On November 10, 1911, the plaintiff bought the Hotel Central property in the village, consisting of a hotel, barber shop, barroom, and livery, on contract, and agreed to pay therefor the sum of $12,000. On March 6, 1912, the defendant village adopted an ordinance requiring all saloon keepers in said village to pay a license fee of $500. We quote from the brief of appellant:

"In April, 1912, the plaintiff made application for a license to conduct a saloon in his said hotel, and filed his application and bond therefor with the village council. On the evening of April 8, 1912, and before the village council met to pass upon the liquor applications, said meeting night being fixed by statute, the plaintiff was approached by a Mr. Thompson, one of the members of the defendant village council, who said to the plaintiff: 'You had better get busy and pay in your money. If you don't get your money up to the council meeting tonight, you won't get any application; they won't accept your application at all.' The plaintiff was further told at that time by Mr. Thompson that if he waited until May 1st to pay he would not get a license. Mr. Thompson said he had been authorized to say those things by the council and the village attorney. * * *

"After the above conversation the plaintiff paid the sum of $500 into the village treasury to obtain such village license in accordance with the village ordinance. The village council met that same night and approved of the plaintiff's application and bond.   *   *   *

"In April, 1913, the plaintiff again made application to said defendant village for a license to conduct a saloon in his said hotel, and filed his application and bond therefor with the village council.

"On the night before the village council met to pass upon liquor applications the president of said defendant village called upon the plaintiff and said: 'Boys, there is no question of a doubt but what you have got to put up your money. The way I feel in regard to it, I am opposed to it. I don't want to see you put up your money, but the council has instructed me to come and tell you you have got to put it up or you won't have any application for license due this next year.'

"At about 5 o'clock in the afternoon of the day the council met the village treasurer called upon the plaintiff, and said: 'Baldwin, this is your last chance. You have either got to put up your money or the boys won't act upon your application. I have been authorized by them to come down and tell you.'   *   *   *

· "After the above conversations the plaintiff paid the sum of $500 into the village treasury to obtain such village license in accordance with the village ordinance. The village council met that same night and approved of the plaintiff's application and bond."

It is the claim of the plaintiff that the hotel property was worth the sum of $12,000, and that, if the liquor license was refused the hotel, the property would not be worth to exceed the sum of $5,000, and that to avoid this depreciation in the value of the property the money was paid, and that the action of the council amounted to duress. The circuit judge thought otherwise, and directed a verdict for the defendant. The case is brought here by writ of error.

It was conceded in the court below and is conceded here that the village ordinance was void, so that the only question is: Were the payments of $500 each

of the two years made voluntarily? The defendant insists they were, while plaintiff insists that under the situation disclosed by the record the village subjected him to duress. Whether valid or not, the village had an ordinance requiring the fees which plaintiff paid as a condition of doing business. It is fair to assume that counsel for appellant in their statement of facts will call attention to the strongest proof in favor of their clients, and an examination of the record shows they have done so. There is nothing in the record to indicate that the tax was paid under protest, and it may safely be assumed that, if the council failed to approve of the bond and application of the plaintiff for a license when he was legally entitled to it, the courts would grant him relief upon proper application. He did not appeal to the court. As before stated, he paid the fee without protest, and it was not until after he had sold the property that he brings this suit.

The question of duress has been before this court in *Hackley* v. *Headley*, 45 Mich. 569 (8 N. W. 511), and *Knight* v. *Brown,* 137 Mich. 396 (100 N. W. 602), and is there defined. The instant case does not come within the definition. We think the case is governed by *Betts* v. *Village of Reading,* 93 Mich. 77 (52 N. W. 940), and the cases cited therein. See, also, *Eslow* v. *City of Albion,* 153 Mich. 720 (117 N. W. 328, 22 L. R. A. [N. S.] 872).

Judgment is affirmed.

Stone, Ostrander, and Steere, JJ., concurred with Moore, J.

This case was assigned to the late Justice McAlvay.

McAlvay, J. (*dissenting*). Plaintiff brought suit against defendant in an action of assumpsit to recover the sum of $1,000 claimed to have been paid by him to

the said defendant involuntarily and under duress. A trial had before the court with a jury resulted in a verdict directed by the court in favor of the defendant and against plaintiff. Upon this verdict a judgment was duly entered. Plaintiff has removed the case to this court for review, assigning errors upon the action of the court in directing a verdict against him.

Plaintiff had been a resident of defendant village for over 30 years, and from May, 1911, up to May 1, 1912, was engaged in business in said village as a retail liquor dealer, in partnership with a man named Sutter. In November, 1911, he purchased upon contract, for the sum of $12,000, "the Hotel Central property," in said village, consisting of the hotel, barber shop, barroom, and livery. Defendant village is incorporated under the laws of this State, and as such exercises all the rights and privileges of incorporated villages and the power and authority to grant applications and approve the bonds of those intending to enter into the business of selling intoxicating liquors at retail within said village, as provided by the statutes of this State.

On March 6, 1912, defendant village adopted an ordinance entitled "An ordinance relative to saloons and saloon keepers," requiring every person desiring to keep a saloon within the village before entering upon such business to apply for and procure a license and to pay the sum of $500 into the village treasury.

Plaintiff, intending to enter into the business of retail dealer in said village from and after May 1, 1912, in April of that year filed his application and bond therefor, as provided by the statute, with the village council for its approval, to conduct a saloon in his said hotel. On the evening of April 8, 1912, the date fixed by law for the village council to meet and pass upon liquor dealers' applications and bonds, and before such meeting, plaintiff was approached by Mr. Thompson,

one of the members of the village council, who said he had been authorized by said council to say to him that he could not get out of it; that it would be $500 more this year than last; that if he did not get his money up to the council meeting that night his application would not be granted; that if he waited until May 1st he would not get a license. Plaintiff, on this threat, paid $500 into the village treasury, and received the treasurer's certificate therefor, which was submitted to the council, with his application and bond for a State license, at the council meeting that evening.

The record of the council proceedings shows that all applications and bonds accompanied by the village treasurer's certificate of $500 were approved unanimously by the council, and the application and bond of one person which were not accompanied by the treasurer's certificate for $500 were rejected for that reason. Afterwards plaintiff paid to the county treasurer $500, as required, to carry on the business of a retail liquor dealer for the ensuing year, and received his tax receipt therefor, and entered upon and conducted such business during that year at his hotel.

In April, 1913, plaintiff, desiring to continue such business at the same place, again made application to defendant village council, and filed his application and bond to carry on business as a retail liquor dealer in said village for granting and approval. At this time Dr. Elliot was president of the village. Plaintiff had several conversations with him, the last one on the day fixed by law for the approval of applications and bonds of liquor dealers by the village council, in which the president said to him that he must put up the $500; that the council had instructed him to come and tell plaintiff that he must pay the money or he would not have any application for a license approved that year. Later, on the same day, plaintiff having delayed until 5 o'clock in the evening without making this pay-

ment, Mr. Slack, village treasurer, came to him and
told him that he must put up the money or the council
would not act on his application; also that he was
authorized by them to come and tell him. Plaintiff
then paid the money. Other witnesses testified as to
these demands made upon the plaintiff by members
of the council and officers of the defendant village
both in 1912 and 1913. Plaintiff at this time owed a
large amount upon this hotel property, for which he
had agreed to pay $12,000, and further testified that
the action of the village in demanding this extra license
money crippled him in his business.

The evidence on the part of the plaintiff is undis-
puted. Defendant village offered no testimony in the
case; the verdict in favor of defendant having been
directed on motion made in its behalf at the close of
plaintiff's case. Upon the trial of the case it was con-
ceded by the defendant village that the ordinance was
invalid, and that it had no authority or power to pass
it. The contention on the part of the defendant upon
the trial was that these payments by plaintiff were vol-
untary, and therefore he was not entitled to recover.

The only question for the court to consider in this
case is whether these payments so admitted to have
been made by the plaintiff to the defendant village
were voluntary or involuntary. In considering this
question we are required to apply the rule so often in-
voked, in cases where a verdict has been directed, to
give the evidence in the case on the part of the appel-
lant its strongest probative force in his favor.

The court and counsel for defendant have relied upon
the case of *Betts* v. *Village of Reading*, 93 Mich. 77
(52 N. W. 940), and it is insisted that this case is
controlling of the case at bar. If the instant case can-
not be distinguished from the *Betts Case*, such con-
tention must be conceded.

In the case we are considering the situation was

somewhat peculiar. The common council of defendant village, by the provisions of the general liquor law of this State, was the only body with authority and power to pass upon and approve the applications and bonds of all persons who desired to enter into the business of selling intoxicating liquors at retail within the village of Chesaning. They had passed this ordinance for the purpose of obtaining from every such applicant the sum of $500 to be covered into its treasury for municipal uses, and they have succeeded. Upon each of the instances when these payments were made by plaintiff to defendant upon the day fixed by law when the council was required to act upon saloon applications and liquor bonds, members of the council authorized by it came to plaintiff and made these demands for $500 to be paid to the village, coupled with the threat that, if such sum was not paid forthwith, plaintiff's application and bond would not be approved. On the last of these occasions the performance of this duty was delegated to the president and treasurer of the village. The authority of these members of the council and officers of the village government to make these demands and threats is not only undisputed, but the ratification of their acts and threats and the adoption of what they did in the premises clearly appears from the records of the respective meetings of the common council read into the record in this case. It cannot be said in this case that this was not the act of the village council. When these applications and dealer's bonds were before the council for consideration, it appeared that the application and bond of plaintiff were accompanied by the receipt and certificate of the village treasurer and were approved, because it appeared that the $500 extra had been paid. It further appeared that the application of another person was rejected because it was not accompanied by the treasurer's receipt and certificate for $500. In this

respect it is apparent that the instant case is distinguishable from the *Betts Case,* where the court said that none of the officers of the village made any threats of prosecution, and there was only random talk by the village attorney; nor in the *Betts Case* does it appear that threats were made by village officers and their acts ratified by the village council, which was in a position to cripple a man in his business by refusing to approve his application and bond as a retail liquor dealer.

On examination of all of the cases which have been before this court relative to payments of this character to municipal officers, there is no one of them where the facts are similar to those in the instant case. The only thing in common between these cases and the case at bar is that a municipality has unlawfully taken money from a saloon keeper and been allowed to retain it.

It is apparent from the record that the only alternative plaintiff had when this illegal demand was made by members of the council of defendant village was to make the payment, or discontinue business. Such being the case, can it be said that the payments were made voluntarily? These payments made by plaintiff are admittedly illegal exactions, and it is apparent that they were made under apprehension of not being allowed to go on in his business if they were not paid. This being so, the case would come within that class where payments made to prevent apprehended injury to business are held to be involuntary and made under duress. This principle has been recognized by the Federal and several of our best State Supreme Courts.

The case of *Swift Co.* v. *United States,* 111 U. S. 22 (4 Sup. Ct. 244), is cited in *American Brewing Co.* v. *City of St. Louis,* 187 Mo. 367 (86 S. W. 129, 2 Am. & Eng. Ann. Cas. 821, and note), in support of the proposition that payments coerced under duress or compul-

sion, though not made in ignorance of the facts, may be recovered. Within this rule are payments of illegal charges or exactions under apprehension on the part of the payers of being injured in their business if the money is not paid. In the reported case cited *supra,* the supreme court of Missouri said:

"It is   *   *   *   well settled that payments coerced under duress or compulsion may be recovered. What constitutes duress has been the subject of much discussion. The general rule was first laid down that: 'A payment is not to be regarded as compulsory unless made to emancipate the person or property from an actual and existing duress imposed upon it by the party to whom the money is paid, or to prevent a seizure by a party armed with apparent authority to seize the property. The courts, however, have shown a tendency in the later decisions to extend the doctrine of the earlier common law with regard to compulsory payment, and at the present time, beyond a few   *   *   * principles, they do not attempt to lay down any definite and exact rule of universal application by which to determine whether a payment is voluntary or compulsory.' 22 Am. & Eng. Enc. of Law (2d Ed.), p. 613, and cases cited.

"Among the instances of the relaxation of the strictness of the original rule is the case of payments constrained by business exigencies; that is, payments of illegal charges or exactions under apprehension on the part of the payers of being stopped in their business if the money is not paid."

This view of the case was recognized by the trial court, when it said:

"There are courts in this country that hold that a payment made in the manner in which this one was made by the plaintiff in this case is a payment by compulsion."

We find that the supreme courts of the States of Massachusetts, Illinois, Ohio, Missouri, and other States, have so held. The learned trial judge gave as a reason for not so holding that, in his opinion, there was no evidence to show that the council, as a council,

did act. As we have already stated, the record shows without dispute that this was the action of the defendant village of Chesaning. It further shows that it received the money into its treasury without consideration. In our opinion, these payments made under these circumstances were not voluntary payments, and assumpsit will lie to recover the amounts unlawfully paid. Plaintiff was not, as is intimated in the brief of defendant, seeking to recover for damage to his business. He asks simply the return of his money, which defendant village has received unlawfully and without consideration. The court was in error in directing a verdict against him.

The facts in this case are undisputed. We hold that these payments were involuntary payments. There is no defense which can be interposed to defeat plaintiff's claim.

Therefore the judgment of the circuit court is reversed, and a new trial ordered.

BROOKE, C. J., and KUHN, and BIRD, JJ. The foregoing opinion was prepared by the late Justice MC-ALVAY. We are satisfied with his conclusions.